THE VAUGHN MACHINERY COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 920–R. Filed July 31, 1958.

*Walter E. Barton, Esq.*, and *Karl K. Morris, C. P. A.*, for the petitioner.

*Frank H. Harvey, Jr., Esq.*, and *James H. Prentice, Esq.*, for the respondent.

FORRESTER, *Judge:* By its unilateral order, the Renegotiation Board determined that in 1952 petitioner had realized excessive profits subject to renegotiation in the amount of $200,000, all of which is in issue.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found, the stipulations being incorporated herein by this reference.

Petitioner is a corporation organized under the laws of the State of Ohio, with its principal place of business at 20 Broad Street, Cuyahoga Falls, Ohio. It was formed in 1889 to take over and operate the business of a partnership originally organized in 1856, and which had begun in 1870 to engage in the production of wire-drawing machinery. Petitioner has been so engaged since its inception.

There are various types of wire- and bar-drawing machines. A given machine is capable of beginning with a bar, rod, or wire of a specified thickness or within a specified range of thicknesses, and drawing it down to a specified diameter or within a specified range of possible diameters. Drawings range from 4-inch bars to 0.0004-inch wires.

Petitioner is the only company in the United States which manufactures and sells a full line of bar- and wire-drawing machinery. In 1952 it produced 26 different types of wire-drawing machines. The machines ranged from approximately 7,000 pounds to 30,000 pounds in weight, and from $10,000 to $40,000 each in price.

In 1951, petitioner received orders for 101 machines capable of manufacturing 0.015-inch stainless steel wire, from the following customers:

Allegheny Ludlum Steel Corporation
Alloy Metal Wire Company, Inc.
Crucible Steel Company
Fort Wayne Metals Company
Indiana Steel & Wire Company
Kenmore Metals Corporation
Sylvania Electric Products, Inc.

The foregoing machines were delivered in 1952. Each has a useful life of 25 years. Approximately 70 per cent of the machines are capable, without conversion, of manufacturing wire other than stainless steel.

All of the foregoing customers had entered into prime facilities contracts with the Signal Corps of the United States Army, under a production plan known as the "Spiral Four Program" (hereinafter called the Program). This Program, which sought the production of a certain type of cable, required, *inter alia*, substantial quantities of stainless steel wire. Title to the machines was to vest in the Government upon acquisition by or installation in a respective customer's plant.

Stainless steel wire is comparatively difficult to manufacture, and has been produced in the United States only since about 1934. The prime contracts required the seven foregoing companies to manufacture or otherwise acquire for the Government the machines necessary for its production. At that time the requirements of the Signal Corps exceeded by several times existing productive capacity.

It was understood that speed was essential and interchangeability desirable, and, accordingly, the seven customers were prevailed upon to accept standard specifications, contrary to usual practice, whereby each mill sets its own standards. Although petitioner dealt directly with the seven companies, it was aware that ultimately the Government would pay for the machines. Competitive bidding was not required by the prime contracts, but competition existed to some degree between petitioner and other manufacturers.

The machines manufactured by petitioner in connection with the Program were of standard types, except for minor changes, and petitioner's activities under the Program were essentially multiple manufacture of machines with standardized specifications. Although

standardization resulted or should have resulted in substantial cost savings, the costs and prices of those machines were determined in accordance with the usual formula used by petitioner, irrespective of whether the customers had a contract or subcontract subject to renegotiation. The orders received as a result of the Program did not require expansion of facilities or new capital investment. The machines produced for the Program were essentially the same as those produced for other customers during 1952.

Orders placed with petitioner pursuant to the Program had priority over other orders. The normal time of delivery prior to the receipt of the Program orders was 7 to 9 months. As a result of those orders, delivery time on other orders became 12 to 14 months. Petitioner was entitled to a priority in the acquisition of materials needed to fulfill its commitments under the Program.

Under the prime contracts the machines could, under stated conditions, be leased by the Government to the contractors or others for commercial production. Eventually, such leases were entered into with respect to many of the machines produced by petitioner under the Program. The leases to Allegheny Ludlum Steel Corporation and Crucible Steel Company were effective virtually as soon as the machines purchased by those two companies were delivered. All leases were terminable on unilateral notice by the Government in case of mobilization.

As a result of the availability of the machines for commercial production, petitioner's customers directed additional efforts toward the acquisition of stainless steel wire business. Had the machines not been so available, such business would not have been sought or it would in some instances have become necessary to acquire machines by purchase or otherwise. The foregoing leases permitted full-scale commercial production on a 24-hour per day basis. Actual use for commercial production was as follows:

| Lessee | Number of machines | Lease period (inclusive) | Period of actual use as rented equipment (inclusive)[1] | Per cent of total time devoted to commercial production |
|---|---|---|---|---|
| Allegheny Ludlum | 26 | July 1951–June 1956 (with option to renew from year to year) | 1953–1956 | 5.5 |
| Alloy Metal | 12 | May 1954–April 1959 | May 1954–end of 1956 | 36.67 |
| Crucible Steel | 34 | Oct. 1952–Sept. 1957 | Oct. 1952–Feb. 1957 | 1.7 |
| Ft. Wayne | 1 | July 1954–June 1959 | July 1954–Mar. 1957 | 22.0 |
| Indiana Steel | [2] 12 | None | None | None |
| Sylvania | 10 | June 1954–May 1959 | June 1954–Mar. 1957 | 31.95 |
| Techalloy [3] | 2 | Aug. 1954–July 1959 | 9 mos. 11 days on 1 machine; 26 mos. on the other; no dates given. | [4] |
| Brookfield Wire [5] | 4 | None | None | None |

[1] Of necessity, this column includes only such use as is apparent from the record. Continued use after the last date in each case is at least possible, and the dates in the column are not intended as a finding that no commercial use occurred thereafter.
[2] No lease was consummated with respect to these 12 machines.
[3] Diverted by the Signal Corps from Kenmore Metals, the original purchaser.
[4] Undetermined.
[5] Diverted from Kenmore Metals, but not leased.

A number of the leased machines were returned to the Government by the lessees because not needed for commercial use.

From 1946 to 1956, inclusive, petitioner sold in each year machines of the type produced for the Program as follows:

| Customer | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Allegheny Ludlum | 1 | ------ | 1 | 3 | ------ | 1 | 26 | ------ | ------ | ------ | ------ |
| Alloy Metal | 2 | ------ | 1 | ------ | 1 | 1 | 12 | ------ | ------ | ------ | ------ |
| Crucible Steel | ------ | 1 | ------ | ------ | ------ | ------ | 34 | ------ | ------ | ------ | ------ |
| Ft. Wayne Metals | ------ | ------ | ------ | ------ | ------ | ------ | 1 | ------ | ------ | ------ | ------ |
| Ind. Steel & Wire | ------ | ------ | ------ | ------ | ------ | ------ | 12 | ------ | ------ | ------ | ------ |
| Kenmore Metals | ------ | ------ | ------ | ------ | ------ | ------ | 6 | ------ | ------ | ------ | ------ |
| Sylvania | ------ | ------ | ------ | ------ | ------ | 4 | 10 | ------ | 4 | ------ | ------ |
| Others | 78 or ¹81 | 66 | 39 | 36 | 35 | 31 | 21 or ¹26 | 30 | 10 | 11 | 12 |
| Total | 81 or ¹84 | 67 | 41 | 39 | 36 | 37 | 122 or ¹127 | 30 | 14 | 11 | 12 |

¹ Indicates a conflict between exhibits.

In the same period total machines sold each year by petitioner, sales of the type produced for the Program, and the ratio of the latter to the former, were as follows:

| | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total sales | 201 | 251 | 325 | 179 | 151 | 149 | 213 | 162 | 117 | 97 | 150 |
| Stainless steel | 78 | 67 | 41 | 39 | 36 | 37 | 127 | 30 | 14 | 11 | 12 |
| Percentage | 38.8 | 26.7 | 12.6 | 21.8 | 23.8 | 24.8 | 59.6 | 18.5 | 12.0 | 11.3 | 8.0 |

During World War II the major part of petitioner's business consisted of the manufacture of rubber machinery and tube-drawing machinery. The years immediately following World War II constituted a "boom" period for wire-drawing machinery, because the demand had been suppressed during wartime, and petitioner's wire-drawing machinery business enjoyed a large increase.

Petitioner has had for many years an experimental department, which has resulted in the improvement of its machines. The machines produced in 1952 for the Program received the benefit of experimentation and research of earlier years, as did machines produced in that year for other customers. Orders are not made by customers for experimental machines, and the expenses of that department are not allocable to specific orders or items of income. Petitioner has consistently treated the expense of the experimental department as overhead, and distributed it ratably over the total business done in each year, based upon factory cost. This practice was followed in 1952 with respect to renegotiable and nonrenegotiable business.

Petitioner maintains on its books an engineering account, which includes various items of expenses incurred in respect of the business as a whole and not directly allocable to specific items of receipt. Such expenses, as in the case of research and experimental costs, are treated as overhead and allocated ratably over the year's business upon the basis of factory cost.

Research and experimental expenses and engineering expenses of the above-described nature for the period 1941 to 1956, inclusive, were as follows:

| Year | Engineering | Experimental and research | Total |
|------|------------|---------------------------|-------|
| 1941 | $84,887.78 | $696.01 | $85,583.79 |
| 1942 | 102,156.31 | 5,512.99 | 107,669.30 |
| 1943 | 99,706.51 | 9,031.23 | 108,737.74 |
| 1944 | 97,474.34 | 2,639.61 | 100,113.95 |
| 1945 | 104,815.61 | 3,397.90 | 108,213.51 |
| 1946 | 126,353.83 | · 1,305.38 | 127,659.21 |
| 1947 | 166,910.16 | 12,307.76 | 179,217.92 |
| 1948 | 171,120.75 | 7,153.79 | 178,274.54 |
| 1949 | 158,412.54 | 5,822.78 | 164,235.32 |
| 1950 | 181,883.59 | 4,383.85 | 186,267.44 |
| 1951 | 235,676.49 | 3,826.76 | 239,503.25 |
| 1952 | 230,845.81 | 34,901.14 | 265,746.95 |
| 1953 | 260,974.89 | 20,175.79 | 281,150.68 |
| 1954 | 248,457.34 | 5,365.41 | 253,822.75 |
| 1955 | 255,096.62 | 1,852.01 | 256,948.63 |
| 1956 | 318,116.36 | 8,825.15 | 326,941.51 |

Petitioner's books have at all relevant times been kept on an accrual basis. In 1952, its "renegotiable" and "nonrenegotiable" sales, and the costs, profits, and percentage of profits to net sales attributable to each class of business were as follows:

| | Renegotiable [1] | Nonrenegotiable [1] |
|---|---|---|
| Net sales | $2,160,961 | $2,853,196 |
| Net costs | [2] $1,706,428 | [2] $2,527,434 |
| Net profit | [3] $455,748 | [3] $327,563 |
| Profit ratio | 21.1 | 11.5 |

[1] Characterization as "renegotiable" and "nonrenegotiable" is for convenience only, and is without prejudice to petitioner's contention that parts of the sales under the Program are not subject to renegotiation.

[2] These figures represent the sums of cost of goods sold, indirect manufacturing expense, general and administrative expenses, and selling expenses, from which is then subtracted in each instance a small amount designated in petitioner's books as "other income."

[3] These figures are derived in the following manner:

        Net Sales
  less  Net Costs
        Net Profit per Books
  plus  Premium on Officers' Life Insurance
        Net Profit per Renegotiation Report.

During the years 1941 to 1956, inclusive, petitioner's net sales, costs, other income, net profits, and the percentage of net profits to sales were as follows:

| Year | Net sales | Costs | Other income increased by premiums on officers' life insurance | Net profit | Percentage |
|---|---|---|---|---|---|
| 1941 | $2,079,378.03 | $1,814,860.82 | $12,119.63 | $276,636.84 | 13.0 |
| 1942 | 2,503,047.57 | 2,270,366.00 | 19,793.68 | 252,475.25 | 10.1 |
| 1943 | 2,894,807.56 | 2,469,359.87 | 20,710.27 | 446,157.96 | 15.4 |
| 1944 | 2,622,988.94 | 2,501,348.21 | 21,468.22 | 143,108.95 | 5.5 |
| 1945 | 3,071,523.65 | 2,869,472.58 | 18,446.77 | 220,497.84 | 7.1 |
| 1946 | 3,653,753.47 | 3,359,799.81 | 21,860.58 | 315,814.24 | 8.6 |
| 1947 | 4,908,926.17 | 4,342,230.89 | 15,785.51 | 582,480.79 | 11.9 |
| 1948 | 5,251,875.06 | 4,693,949.14 | 26,778.09 | 584,704.01 | 11.1 |
| 1949 | 3,768,151.12 | 3,505,653.18 | 11,994.08 | 274,492.02 | 7.3 |
| 1950 | 3,072,669.94 | 2,987,705.41 | 13,362.24 | 98,326.77 | 3.2 |
| 1951 | 4,240,302.12 | 3,935,608.15 | 10,346.58 | 315,040.55 | 7.4 |
| 1952 | 5,014,157.31 | 4,245,437.88 | 14,592.02 | 783,311.45 | 15.6 |
| 1953 | 4,667,067.46 | 4,396,126.66 | 12,606.55 | 283,547.35 | 6.8 |
| 1954 | 3,318,948.64 | 3,317,853.03 | 14,156.73 | 15,252.34 | 0.5 |
| 1955 | 3,158,366.72 | 3,022,308.93 | 12,868.71 | 148,926.50 | 4.7 |
| 1956 | 6,299,217.16 | 5,727,459.60 | 23,990.72 | 595,748.28 | 9.5 |
| Average profit ratio 1941–1956, inclusive | | | | | 8.66 |
| Average profit ratio 1952–1956, inclusive | | | | | 7.5 |
| Average profit ratio 1953–1956, inclusive | | | | | 5.4 |
| Average profit 1946–1950, inclusive | | | | | 8.4 |

Petitioner's sales, profits, and profit percentage for 1952 after renegotiation were as follows:

| | Renegotiable [1] | Nonrenegotiable [1] | Total |
|---|---|---|---|
| Sales | $1,960,961 | $2,853,196 | $4,814,157 |
| Net profits | $255,748 | $327,563 | $583,311 |
| Profit _____ per cent | 13.0 | 11.5 | 12.1 |

[1] Characterization as "renegotiable" and "nonrenegotiable" is for convenience only, and is without prejudice to petitioner's contention that parts of the sales under the Program are not subject to renegotiation.

The net investment in petitioner's stock and petitioner's net worth and profit ratio thereto as of December 31 in each of the years 1941 to 1952, inclusive, were as follows:

| Year | Net investment in stock | Net worth | Ratio of net profits [1] to net worth |
|---|---|---|---|
| 1941 | $252,500 | $357,583 | 77.4 |
| 1942 | 252,500 | 376,863 | 67.0 |
| 1943 | 204,500 | 375,621 | 118.8 |
| 1944 | 204,500 | 426,070 | 33.8 |
| 1945 | 204,500 | 516,256 | 42.7 |
| 1946 | 204,500 | 643,144 | 49.1 |
| 1947 | 204,500 | 972,024 | 59.9 |
| 1948 | 204,500 | 1,264,810 | 46.2 |
| 1949 | 204,500 | 1,341,660 | 20.5 |
| 1950 | 204,500 | 1,390,419 | 7.1 |
| 1951 | 204,500 | 1,445,736 | 21.8 |
| 1952 | 204,500 | 1,714,607 | 45.7 |

[1] See net profits figures in previous table.

(The record does not show this data for 1953 to 1956, inclusive.)

Petitioner sold in 1952 under the Program various types of machines as follows:

| Type | Number sold | Number of customers | Price | Cost | Profit Dollars | Profit Per cent |
|---|---|---|---|---|---|---|
| 5/6-HR | 6 | 4 | $329,212 | $304,606 | $24,606 | 7.5 |
| 6/7-HIV | 11 | 4 | 441,948 | 370,677 | 71,271 | 16.1 |
| 6/7-HFV | 16 | 5 | 555,880 | 422,347 | 133,533 | 24.0 |
| 12-HF | 55 | 6 | 640,645 | 448,626 | 192,019 | 30.0 |
| 12-HIO | 3 | 2 | 51,463 | 43,523 | 7,940 | 15.4 |
| Take-up frames | 10 | 1 | 121,160 | 104,695 | 16,465 | 13.6 |

All machines of each type above set forth had substantially identical specifications, although, except in the case of the take-up frames, they were sold to different customers.

During the years 1946 to 1955, inclusive, petitioner's sales of the above types of stainless steel wire-drawing machines (including sales in 1952 not under the Program) were as follows:

| Year | Number sold | Number of customers | Price | Cost | Profit (loss) Dollars | Profit (loss) Per cent |
|---|---|---|---|---|---|---|
| **5/6-HR** | | | | | | |
| 1946 | 8 | 5 | $174,588 | $168,601 | $5,987 | 3.4 |
| 1947 | 15 | 5 | 347,842 | 340,556 | 7,286 | 2.1 |
| 1948 | 7 | 5 | 259,935 | 221,737 | 38,198 | 14.7 |
| 1949 | 6 | 3 | 242,354 | 231,423 | 10,931 | 4.5 |
| 1950 | 3 | 2 | 96,521 | 94,146 | 2,375 | 2.5 |
| 1951 | 2 | 2 | 88,819 | 86,902 | 1,917 | 2.2 |
| 1952 | (1) | | | | | |
| 1953 | 3 | 3 | 133,811 | 122,935 | 10,876 | 8.1 |
| 1954 | 2 | 2 | 120,209 | 136,389 | (16,180) | (13.5) |
| 1955 | 1 | 1 | 56,378 | 60,095 | (3,717) | (6.6) |
| **6/7-HIV** | | | | | | |
| 1946 | 19 | 10 | 334,408 | 300,881 | 33,527 | 10.0 |
| 1947 | 8 | 3 | 159,007 | 136,727 | 22,280 | 14.0 |
| 1948 | 13 | 7 | 287,874 | 253,913 | 33,961 | 11.8 |
| 1949 | 2 | 2 | 58,338 | 56,985 | 1,353 | 2.3 |
| 1950 | 3 | 2 | 80,067 | 73,630 | 6,437 | 8.0 |
| 1951 | 16 | 4 | 527,630 | 482,119 | 45,511 | 8.6 |
| 1952 | (1) | | | | | |
| 1953 | 2 | 2 | 65,932 | 58,816 | 7,116 | 10.8 |
| 1954 | 3 | 2 | 94,779 | 95,472 | (693) | (0.7) |
| 1955 | 1 | 1 | 40,095 | 43,699 | (3,604) | (9.0) |
| **6/7-HFV** | | | | | | |
| 1946 | 11 | 3 | 141,561 | 129,747 | 11,814 | 8.3 |
| 1947 | 3 | 2 | 43,003 | 43,371 | (368) | (0.9) |
| 1948 | 4 | 3 | 97,203 | 78,543 | 18,660 | 19.2 |
| 1949 | 2 | 1 | 46,709 | 41,062 | 5,647 | 12.1 |
| 1950 | 1 | 1 | 23,000 | 22,420 | 580 | 2.5 |
| 1951 | 4 | 4 | 103,929 | 88,490 | 15,439 | 14.9 |
| 1952 | 2 | 2 | 56,012 | 47,268 | 8,744 | 15.6 |
| 1953 | (2) | | | | | |
| 1954 | 3 | 3 | 102,831 | 99,960 | 2,871 | 2.8 |
| 1955 | (2) | | | | | |

| Year | Number sold | Number of customers | Price | Cost | Profit (loss) Dollars | Profit (loss) Per cent |
|---|---|---|---|---|---|---|
| **12–HF** | | | | | | |
| 1946 | 19 | 5 | $70,605 | $64,620 | $5,985 | 8.5 |
| 1947 | 18 | 5 | 82,892 | 64,421 | 18,471 | 22.3 |
| 1948 | 13 | 2 | 66,982 | 58,991 | 7,991 | 11.9 |
| 1949 | 15 | 5 | 92,808 | 78,508 | 14,300 | 15.4 |
| 1950 | 13 | 2 | 100,027 | 93,415 | 6,612 | 6.6 |
| 1951 | 5 | 4 | 48,722 | 42,265 | 6,457 | 13.3 |
| 1952 | 13 | 5 | 152,867 | 112,173 | 40,694 | 26.6' |
| 1953 | (2) | | | | | |
| 1954 | 2 | 1 | 27,880 | 23,885 | 3,995 | 14.3 |
| 1955 | 6 | 3 | 72,092 | 55,546 | 16,546 | 23.0 |
| **12–HIO** | | | | | | |
| 1946 | 14 | 5 | 89,396 | 72,919 | 16,477 | 18.4 |
| 1947 | 10 | 4 | 75,928 | 64,546 | 11,382 | 15.0 |
| 1948 | 4 | 1 | 33,321 | 23,454 | 9,867 | 29.6 |
| 1949 | 13 | 6 | 131,839 | 105,041 | 26,798 | 20.3 |
| 1950 | 14 | 3 | 147,656 | 125,883 | 21,773 | 14.7 |
| 1951 | 6 | 5 | 84,832 | 69,708 | 15,124 | 17.8 |
| 1952 | (1) | | | | | |
| 1953 | 13 | 3 | 183,138 | 147,330 | 35,808 | 19.6 |
| 1954 | (2) | | | | | |
| 1955 | 3 | 2 | 46,090 | 38,262 | 7,828 | 17.0 |
| **Take-up frames** | | | | | | |
| 1946 | 7 | 6 | 102,907 | 107,006 | (4,099) | (4.0) |
| 1947 | 13 | 5 | 212,936 | 202,412 | 10,524 | 4.9 |
| 1948 | (2) | | | | | |
| 1949 | 1 | 1 | 53,988 | 48,653 | 5,285 | 9.8 |
| 1950 | 2 | 2 | 97,099 | 89,738 | 7,361 | 7.6 |
| 1951 | 4 | 3 | 84,295 | 77,466 | 6,829 | 8.1 |
| 1952 | 6 | 3 | 156,927 | 135,507 | 21,420 | 13.6 |
| 1953 | 12 | 1 | 62,890 | 49,119 | 13,771 | 21.9 |
| 1954 | 4 | 2 | 222,638 | 216,666 | 5,972 | 2.7 |
| 1955 | (1) | | | | | |

[1] None, except those sold under the Program.
[2] None.

Petitioner financed its undertakings in connection with the Program solely through its own working capital. Material was conserved by reducing spoilage to 2 per cent from the normal rate of 5 per cent. No unusual bonuses or increases in salary were paid in 1952.

Before petitioner received orders for any machines under the Program its financial status and physical plant were investigated, and found to be in satisfactory condition. Management was determined to be satisfactory and the machine shop facilities were regarded as excellent. Petitioner's performance was likewise considered to be excellent.

In 1952, on net sales in the amount of $1,960,961 (the amount of petitioner's actual net sales under the Program plus a small amount of other "renegotiable" sales, reduced by $200,000), petitioner's ex-

pectable net profits, on the basis of its past history, were in the amount of approximately $232,000.

Petitioner's deliveries to other customers were delayed several months as a result of the Program. Many sales which were made in 1953, when net profits were slightly below 7 per cent of sales, would, but for the Program, have been consummated in 1952.

### OPINION.

Petitioner first contends that section 106 (c) of the Renegotiation Act of 1951 applies.[1] Under this theory, only five twenty-fifths of profits realized under the Program would be subject to renegotiation. A careful reading of the statute cited requires us to reject that argument.

Subcontracts whereby a purchaser acquires equipment for the account of the Government are expressly denied relief, pursuant to section 106 (c) (2) (B). The purchases here in question were clearly for the account of the Government.

Petitioner argues that the leases executed by the Government place it in as favorable an equitable position as manufacturers afforded relief under the express terms of the statute. That argument, however appealing, is irrelevant here. This Court has no equitable jurisdiction and the statute clearly and unambiguously requires us to deny to petitioner the advantage sought. Cf. *Emilie Furnish Funk*, 29 T. C. 279, on appeal (C. A. 9). There is no ambiguity, and thus no room for the "liberal" interpretation urged. *House-O-Lite Corporation*, 24 T. C. 720, 721; and cf. *Riley Co.* v. *Commisioner*, 311 U. S. 55, 59. Petitioner, in effect, urges us to legislate. That we may not do.

---

[1] SEC. 106. EXEMPTIONS.
    (c) PARTIAL MANDATORY EXEMPTION FOR DURABLE PRODUCTIVE EQUIPMENT.—
        (1) IN GENERAL.—The provisions of this title shall not apply to receipts or accruals (other than rents) from subcontracts for new durable productive equipment, except to that part of such receipts or accruals which bears the same ratio to the total of such receipts or accruals as five years bears to the average useful life of such equipment as set forth in Bulletin F of the Bureau of Internal Revenue (1942 edition) or, if an average useful life is not so set forth, then as estimated by the Board.
        (2) DEFINITIONS.—For the purpose of this subsection—
            (A) the term "durable productive equipment" means machinery, tools, or other equipment which does not become a part of an end product acquired by any agency of the Government under a contract with a department, or of an article incorporated therein, and which has an average useful life of more than five years; and
            (B) the term "subcontracts for new durable productive equipment" does not include subcontracts where the purchaser of such durable productive equipment has acquired such equipment for the account of the Government, but includes pool orders and similar commitments placed in the first instance by a Department or other agency of the Government when title to the equipment is transferred on delivery thereof or within one year thereafter to a contractor or subcontractor.

It is unnecessary to determine whether a different result would be required by section 106 (c) as amended in 1954 and 1955.[2] Those amendments effected changes in the law applicable only to fiscal years ending on or after June 30, 1953. There is no evidence before us that any part of the profits in question was earned in such a fiscal year of the petitioner.

We must now determine whether in fact petitioner realized excessive profits under the Program in 1952. The Board has determined that profits were excessive in the amount of $200,000. Petitioner bears the burden of proving that determination erroneous. *Stoner Manufacturing Corp.* v. *Secretary of War*, 21 T. C. 200; *Providence Wool Combing Co.* v. *Secretary of War*, 14 T. C. 979; *Western Precipitation Corporation* v. *R. F. C.*, 9 T. C. 877; *Nathan Cohen* v. *Secretary of War*, 7 T. C. 1002.

Petitioner claims that in 1951 and 1952 it lost business as a result of the Program, and that in accepting orders under the Program it assumed a risk of saturation of its post-1952 market. The foregoing matters are claimed to constitute a "risk" or "other factor" within the purview of section 103 (e) (3) and/or (6),[3] and that as a result, petitioner realized no excessive profits in 1952.

---

[2] SEC. 106. EXEMPTIONS.

  (c) PARTIAL MANDATORY EXEMPTION FOR DURABLE PRODUCTIVE EQUIPMENT.—

    (1) IN GENERAL.—The provisions of his title shall not apply to receipts or accruals (other than rents) from contracts or subcontracts for new durable productive equipment, except (A) to that part of such receipts or accruals which bears the same ratio to the total of such receipts or accruals as five years bears to the average useful life of such equipment * * * and (B) to receipts and accruals from contracts for new durable productive equipment in cases in which the Board finds that the new durable productive equipment covered by such contracts cannot be adapted, converted, or retooled for commercial use.

    (2) DEFINITIONS.—For the purpose of this subsection, the term "durable productive equipment" means machinery, tools, or other productive equipment, which has an average useful life of more than five years.

[3] SEC. 103. DEFINITIONS.

For the purposes of this title—

  *      *      *      *      *      *      *

  (e) EXCESSIVE PROFITS.—The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

    (1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

    (2) The net worth, with particular regard to the amount and source of public and private capital employed;

    (3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

    (4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contactors [*sic*] in supplying technical assistance;

    (5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

    (6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

The six "factors" set forth in section 103 (e) (as well as the matter of efficiency also mentioned therein) are merely quantitative. The presence in a given case of one or more of such factors does not automatically require a finding of no excessive profits. It is evidence, to be weighed together with other evidence, of the existence, or absence of such profits, and, if excessive profits were realized, the amount thereof. And we may not assume, but it must be affirmatively proved by petitioner, that the Board has failed to give proper consideration and weight in reaching its determination to all evidence favoring petitioner, including the matters enumerated in the foregoing statute.

We believe that petitioner did lose some business in 1951 and 1952 as a result of the Program, although not to the extent claimed, and less, in terms of net sales, than business acquired solely because of the Program, but the record utterly fails to convince us that the business lost would have resulted in profits as high as those realized under the Program, or, indeed, higher than those attained on other civilian business in that year.

We are likewise satisfied that petitioner assumed a risk that its post-1952 market would be saturated to some extent and some business subsequently lost as a result of the Program. In this connection, we do not deem tenable respondent's objections to evidence of the sales and profits of such later years. Far from being irrelevant and immaterial, it is the best evidence available of the risk undertaken in 1952. It is, of course, not itself conclusive, but will vary in probative value according to the extent to which it appears to have been caused by the Program.

We conclude that, while petitioner assumed a risk of the nature alleged, it was not nearly as extensive as claimed. In part, petitioner's own evidence requires this conclusion.

The average useful life of the machines here in issue was 25 years, yet the decline in petitioner's business after 1952 lasted no longer than 3 years, and was followed in 1956 by a rise in sales to an unprecedented level. No lease for commercial use was consummated with respect to 16 of the 101 machines sold under the Program. None of the 85 machines leased was actually so used for more than a fraction of the time; 60 for an almost insignificant portion (1.7 per cent in the case of 34 machines and 5.5 per cent in the case of 26 machines). And the leases with respect to 23 of the remaining machines were first consummated in mid-1954, well into the post-1952 decline in petitioner's business, which it here seeks to ascribe to the Program. Moreover, the leases covering these 23 machines, which received by far the most extensive commercial use of any so leased, continued at least throughout 1956, in which year, as previously noted, petitioner's

net sales reached an all-time high. There is no evidence of the extent to which the remaining 2 machines were used for commercial production. In summary, even accepting and giving great weight to the evidence of actual events after 1952, the record fails to establish that any risk of market saturation was assumed in 1952 which was not properly and adequately considered by the Board.

Petitioner argues in its brief that while the profit realized on commercial sales in 1952 represented 11.5 per cent of net sales, its profit under the Program remaining after renegotiation represents 11.8 per cent of net sales, and that the Board thus allowed profit under the Program to exceed that on nonrenegotiable transactions by only 0.3 per cent. It contends that such small additional allowance proves that the Board failed to give more than token consideration to the factors enumerated in section 103 (e) other than normal earnings.

Whatever might have been the legal tenability of that argument, were the record to contain the facts upon which it relies, it cannot prevail here, as it is based upon an arithmetical error.

In 1952, actual net sales and net profits under the Program were, respectively, $2,160,961 and $455,748, with a resulting rate of profit of 21.1 per cent. These figures, after renegotiation are, respectively, $1,960,961, $255,748, and 13.0 per cent, *not* 11.8 per cent as computed by petitioner. Petitioner's error apparently consisted of a failure to reduce net sales as well as net profits by $200,000 in computing the post-renegotiation figures. The basis of the Government's claim is that petitioner received $200,000 more than it should have for its machines, and the remedial post-renegotiation figures merely show the complete picture which would have resulted absent such alleged excess payment.

Ordinarily, there is no reason why the profit ratio on Government business should exceed that on other transactions of a similar nature. Cf. *Western Precipitation Corporation* v. *R. F. C.*, 9 T. C. 877, 881. In fact, where, as here, sales to the Government include factors of standardization and volume production not normally present, the "normal" rate of profit, i. e., that realized on civilian business, may well be excessive. Cf. *Aircraft Screw Products Co.*, 8 T. C. 1037, 1044; *Stein Brothers Mfg. Co.* v. *Secretary of War*, 7 T. C. 863, 886. Here the Board has allowed petitioner a rate of profit under the Program greater than that realized in the same year on nonrenegotiable business to the extent of 1.5 per cent of net sales. We cannot say, on the basis of such a record, that this was inadequate or that the Board failed to treat petitioner fairly.

Furthermore, the foregoing computations are based upon the assumption that 11.5 per cent, the rate of profit realized on nonrene-

gotiable business in 1952, is "normal." Yet in 1946 to 1950, inclusive, characterized as "boom" years by one of petitioner's principal officers, such rate averaged 8.5 per cent. An expert called by respondent estimated petitioner's reasonably expectable profits under the Program to be between $218,000 and $232,000. This estimate, although in response to a hypothetical question, was based upon all material facts in existence at the commencement of petitioner's entry into the Program. The witness used 1947 and 1948 as "normal" years, and it does not appear that he knew or made any adjustment because they were in fact "boom" years. The foregoing strongly suggests that any error or inaccuracy on the part of the Board actually favored petitioner.

While it is not strongly urged, petitioner does seem to contend that it is entitled to some adjustment or consideration for unusual efficiency. This seems to be based upon (1) standardization of specifications, and (2) a reduction of spoilage from the "normal" 5 per cent to 2 per cent.

Efficiency merely somewhat above average is insufficient to influence to any substantial degree the conclusion as to the existence and extent of excessive profits. *Ring Construction Corporation*, 8 T. C. 1070, 1087, appeal dismissed 178 F. 2d 714 (C. A., D. C.), certiorari denied 339 U. S. 943. The record fails to demonstrate that petitioner was generally or in any particular extraordinarily efficient or unusually ingenious in carrying out its duties.

Standardization was required by the Signal Corps, and was agreed to by the seven prime contractors because of such requirement, not as a result of any peculiar competence or persuasiveness on petitioner's part. And reduction of spoilage may well have resulted as a matter of course from standardization and other mass production features of the orders under the Program. Cf. *Stoner Manufacturing Corp.* v. *Secretary of War,* 21 T. C. 200, 211.

Respondent has argued that petitioner overcharged the Program in respect of engineering expenses and research and experimental expenses. We feel that the evidence as a whole does show to be excessive the amounts of these expenses allocated by petitioner to sales under the Program but in view of the fact that we are already amply convinced that the Board did not err to petitioner's prejudice, we need not discuss this point further.

Having carefully and painstakingly reviewed the entire record, we do not find error in the determination of the Board.

*An order will be issued in accordance herewith.*