Reviewed by the Court.

OFFNER PRODUCTS CORPORATION, PETITIONER *v.* RENEGOTIATION BOARD, RESPONDENT

Docket No. 986–R.   Filed September 16, 1968.

*Lester Reinwald* and *Morris Glasser*, for the petitioner.
*Irwin Goldbloom*, for the respondent.

DAWSON, *Judge:* The Renegotiation Board determined that petitioner's profits on renegotiable contracts for the manufacture and sale of electronic jet engine fuel controls to Hamilton Standard Division of United Aircraft Corp., amounting to $205,257.01 for the fiscal year ended December 31, 1954, were excessive to the extent of $75,000.

The issue for decision is whether the profits derived by petitioner from the sales of electronic jet engine fuel controls were excessive to the extent determined by the Renegotiation Board in light of the statutory factors for determining excessive profits as set out in the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1211 *et seq.*

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Offner Products Corp. (herein called petitioner) was incorporated under Illinois law on March 14, 1947, and has its principal office in Schiller Park, Ill. It used an accrual method of accounting and filed its Federal income tax return for the fiscal year ended December 31, 1954, with the district director of internal revenue at Chicago, Ill. Petitioner had the following shareholders, officers, and directors during the year 1954:

| Shareholder | Office held | Number of shares owned— common |
|---|---|---|
| Franklin F. Offner | President-director | 112.5 |
| Irving Hoffman | Vice president-director | 15 |
| Helene L. Offner | Secretary-director | 15 |

Dr. Franklin F. Offner (herein called Offner), who had the controlling interest in petitioner, held the controlling interest and was president of Offner Electronics, Inc. (herein called Electronics). Electronics, which was incorporated under Illinois law on March 6, 1942, was originally formed in 1939 for the purpose of doing medical research and making clinical instruments. It manufactured electroencephalographs (instruments to record brain waves) which Offner had developed. During World War II, petitioner, under Offner's guidance, developed the first heat homing missile, the infrared guided missile, performed services for the Manhattan Project at Oak Ridge in making most of the instruments for the detection of radioactivity, developed instruments to test propellers on aircraft engines, and worked on antisubmarine devices. Offner, who is presently professor of biophysics at Northwestern University, is renowned for his work in biophysics, bioengineering, education, and electronics. He holds the degrees of bachelor of chemistry from Cornell University, master of science in chemistry from California Institute of Technology, and doctor of philosophy in biophysics from the University of Chicago.

In 1943, Dr. William Bollay, the project officer for the Navy in charge of the development of a jet engine, informed Offner that a fuel control was greatly needed and suggested that Offner might be able to develop one employing electronic principles. Although Offner was not permitted to see a jet engine because of its secretive nature, Electronics proceeded with the development of a control with Offner supplying the necessary scientific, engineering, and inventive skills. In late 1945 or 1946, at Wright Field, Dayton, Ohio, the electronic control which Electronics developed was first installed and demonstrated by Offner on a gas turbine engine. This marked the first time that Offner had ever seen a jet engine. The demonstration was made and proved successful. Offner was then requested to contact manufacturers working on jet engines.

After World War II, Offner decided to separate the two types of business in which Electronics was engaged, i.e., the medical research and manufacture of clinical instruments and the aircraft developments. Therefore, in 1947, petitioner was organized in order to segregate the aircraft work. From that time until August 1954, petitioner's principal business was developing and manufacturing an electronic jet engine fuel control.

Petitioner, Offner, and Hamilton Standard Division of United Aircraft Corp. (herein called Hamilton Standard) entered into an agreement on June 30, 1949, relating, in part, to the manufacture of an electronic jet engine fuel control. There were three subsequent amendments to the agreement. Under the agreement Hamilton Standard was to pay petitioner 6 percent on its selling price to engine manufac-

turers for electronic jet engine fuel controls which petitioner was to manufacture for Hamilton Standard. In 1954 petitioner manufactured jet fuel controls on purchase orders, subject to renegotiation, which were received from Hamilton Standard.

On July 16, 1954, petitioner received notice of termination of its order to manufacture the electronic jet engine fuel controls from Hamilton Standard. This was confirmed by purchase-order termination dated August 12, 1954. This marked the end of production of jet fuel controls by petitioner.

In 1954 petitioner had total sales of $638,498.05. Of this amount, $602,971.10, or 94 percent, represented sales subject to renegotiation. These consisted of sales of electronic jet engine fuel controls to Hamilton Standard pursuant to purchase orders from Hamilton Standard.

Petitioner had the following income, costs, and profits for the fiscal year ended December 31, 1954:

| | |
|---|---|
| Sales | $638,498.05 |
| Costs of goods sold [1] | 344,569.91 |
| Gross profit | 293,928.14 |
| Selling, shipping, and general and administrative expenses [2] | 100,999.77 |
| Profit before provision for contribution to Officer Retirement Fund | 192,928.37 |
| Provision for contribution to Officer Retirement Fund | 26,917.41 |
| Net profit on operation | 166,010.96 |
| Other income [3] | 1,633.86 |
| Net income before Federal income tax | 167,644.82 |

[1] Including $32,263.20 for research and development expense.
[2] Including $16,697.11 for advertising expense.
[3] This includes $401.09 for royalty income which the parties agree is allocated to petitioner's renegotiable sales and $1,232.77 for interest income which the parties agree is not allocable to petitioner's renegotiable sales.

All of these items, with the exception of the research and development expense, advertising expense, and other income, were allocated 94 percent and 6 percent, respectively, to renegotiable and nonrenegotiable sales.

The expense in the amount of $32,263.20 for research and development represented money spent for the development of a working model of the dynagraph, a direct writing oscillograph. The advertising expense of $16,697.11 was incurred for advertisements describing the model of a dynagraph developed in 1954. A limited number of dynagraphs had been manufactured by Electronics prior to 1954 to be used as part of the encephalograph. The dynagraph had potential value both within the fields of medical and defense work, and production within both areas was contemplated by Offner. However, since it was

impossible to separate the two fields satisfactorily, the dynagraph was produced by Electronics and advertised only in the name of Electronics. No dynagraphs were ever produced by petitioner. There was no longer any reason for maintaining petitioner's existence, although Offner had hoped to find something else for petitioner to manufacture after the termination of the contracts for electronic jet engine fuel controls.

Petitioner and Electronics were originally in the same building. As the jet fuel control work reached the production stage, a separate building, adjacent to the one housing Electronics, was erected to house the production facilities of petitioner.

During the fiscal years 1947, 1948, 1949, 1952, and 1953, petitioner did not incur any expense for advertising. In years prior to 1954, petitioner and Electronics together incurred over $400,000 in research and development costs with respect to the electronic jet engine fuel control. These costs were written off as they were incurred.

Petitioner's renegotiable sales and profits for the fiscal year ended December 31, 1954, before and after renegotiation, were as follows:

|  | Before renegotiation | After renegotiation |
|---|---|---|
| Sales | $602,971 | $527,971 |
| Profit | $205,257 | $130,257 |
| Percent of sales | 34.04 | 24.67 |

Offner received a salary from petitioner in the amount of $30,000 for the fiscal year ended December 31, 1954.

Petitioner had a net worth as of January 1, 1954, of $146,359.

Petitioner's profits were not excessive in the fiscal year ended December 31, 1954.

#### OPINION

The principal issue is the correctness of respondent's determination that petitioner had excessive profits of $75,000 in the fiscal year ended December 31, 1954, under the Renegotiation Act of 1951, as amended.[1] However, we must first ascertain petitioner's renegotiable profits for that year, and that hinges on the resolution of two preliminary issues: (1) Whether research and development expenses incurred in 1954 are properly allocable to petitioner's renegotiable business and (2) whether advertising expenses incurred in 1954 are properly allocable to renegotiable business.

In this de novo proceeding the burden of proof rests upon petitioner to show errors in the determinations of the Renegotiation Board. *Stoner Manufacturing Corp.* v. *Secretary of War*, 21 T.C. 200 (1953) ; *Vaughn Machinery Co.* v. *Renegotiation Board*, 30 T.C. 949 (1958), affd. 273 F. 2d 235 (C.A. 6, 1959).

---

[1] 50 U.S.C. App. secs. 1211–1233.

In 1954 petitioner incurred research and development expenses in the amount of $32,263.20. It claims that these expenses are allocable to its renegotiable business under section 1459.8(e)(2), Renegotiation Board Regs., which provides as follows:

(e) *Research and development expenses.*—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) Other research and development expenses, likewise allowable in the year under review as costs under the Internal Revenue Code, may be allocated to renegotiable business under certain conditions as follows:

(i) If the expense was incurred in accordance with the usual business practice of the contractor, in basic research not immediately related to any current business but expected to produce ultimate benefit to the contractor's business as a whole; or

(ii) If the expense was incurred in developing processes or products as a preparation to enable the contractor to bid or negotiate for future defense business, or to perform such business more efficiently.

The research expenditures in 1954 relate to the development of the dynagraph. Prior to 1954, the dynagraph had been manufactured by Electronics and used as part of the encephalograph. Similarly, sometime in either 1954 or 1955, Offner decided that only Electronics should produce the dynagraph, despite the fact that it also had potential military uses. The dynagraph was only produced by Electronics and advertised under its name. While Offner testified that petitioner contemplated production of the dynagraph for military purposes after the termination of its contracts for electronic jet engine fuel control, there is no evidence that the production of the dynagraph was contemplated prior to that time, and petitioner never actually produced it.

In our opinion these facts are insufficient to justify an allocation of the research and development expenses to petitioner's renegotiable business. Under section 1459.8(e)(2) such expenses are allocable if they are "expected to produce ultimate benefit to the contractor's business as a whole" or if they are incurred "to enable the contractor to bid or negotiate for future defense business, or to perform such business more efficiently." The dynagraph was produced by Electronics prior to 1954; and, shortly thereafter, Offner decided that it made more sense to continue to have all dynagraphs produced by the same company, namely, Electronics. This is not enough to prove that petitioner realistically expected any "ultimate benefit" from the production of dynagraphs. In 1954 Offner must have known that dynagraphs would be produced only by Electronics. The outside possibility that they might be produced by petitioner will not suffice.

Likewise, while Offner testified that the dynagraph had potential military use, there is no evidence that either of his companies adapted it to such purposes or that the research and development expenses were

incurred in relation to a specific bid or negotiation for future defense work.

We think these expenses clearly fall within the provisions of section 1459.8(e)(4),[2] Renegotiation Board Regs. The research and development expenses incurred by petitioner in 1954 were related to the creation of working models of the dynagraph. Thus, it was "product * * * research in preparation for reconversion" rather than "basic research" as that term is used in section 1459.8(e)(2)(i) of the regulations. Cf. *Lundberg Manufacturing Co.* v. *Renegotiation Board*, T.C. Memo. 1960–183.

Petitioner contends that it can allocate to its 1954 renegotiable business the $16,697.11 cost of advertising the dynagraph. It claims the authority to do this under section 1459.7(b)(2)(ii),[3] Renegotiation Board Regs. We cannot agree. Under the regulations a contractor must show that it "engaged in renegotiable business to the detriment of its *normal* commercial business." (Emphasis added.) But petitioner was organized in 1947 to manufacture the electronic jet engine fuel control. The dynagraph in no way represented part of petitioner's "normal commercial business." It was the business of Electronics. Petitioner never manufactured the dynagraph. Consequently, the advertising expenditures made by petitioner in 1954 are not allocable to its renegotiable business.

In 1954 the petitioner had $602,971.10 in sales subject to renegotiation, an amount representing 94 percent of its total sales. Excluding its research and development expenses which were allocable to its nonrenegotiable business, petitioner's costs of goods sold were in the same ratios and amounted to $293,568.31. Thus petitioner had a gross profit from its renegotiable business of $309,402.79. With the exception of its advertising expenses which were allocable to its nonrenegotiable business, 94 percent of its general and administrative expenses, or $79,244.50, was allocable to petitioner's renegotiable business. This left a profit of $230,158.29 before provision for the contribution to the Officer Retirement Fund. After accounting for a $25,302.37 contribu-

---

[2] Sec. 1459.8(e)(4) provides as follows:

(4) Research and development expenses not meeting the foregoing criteria, and in particular such expenses incurred for production or process research in preparation for reconversion and post-emergency non-defense business, may not be allocated in any part to renegotiable business, or considered in renegotiation for any year.

[3] Sec. 1459.7(b)(2)(ii) provides:

(ii) In cases in which it can be demonstrated that a prime contractor or subcontractor engaged in renegotiable business to the detriment of its normal commercial business in the year under review, and thereby incurred the risk of loss of its competitive position in the industry concerned, the Board will allocate to renegotiable business that portion of the prime contractor's or subcontractor's normal advertising expense which the Board deems properly attributable to the effort by the prime contractor or subcontractor to forestall such loss of competitive position.

tion [4] to that fund and $401.09 in royalty income which is also allocable to renegotiable sales, petitioner had a net profit of $205,257.01 from renegotiable business before Federal income taxes. This is a return on renegotiable sales of 34.04 percent. The return on sales after renegotiation is 24.67 percent.

In arriving at the petitioner's net profit figure ($205,257.01) for the year 1954, we have not allocated to that year any of the research and development expenses which petitioner incurred in prior years. Although such expenses are a factor to be considered in determining the reasonableness of petitioner's costs and profits under section 103(e), petitioner cannot treat them as actual costs, or indeed as allocable costs, of the year 1954.[5] Petitioner expensed these costs as they were incurred, and there is no evidence to show that this treatment was improper for Federal tax purposes or that it did not accurately reflect its income. Therefore, we choose not to exercise the discretion granted us by section 103(b) of the Renegotiation Act, 50 U.S.C. App. sec. 1213(f), to redetermine petitioner's costs in order to better reflect them.

We turn now to the primary issue: Were petitioner's profits excessive for the fiscal year ended December 31, 1954? Section 103(e), Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1213(e), sets forth the statutory definition of the term "excessive profits" and the various factors to be considered in determining excessive profits.[6]

As pointed out previously, petitioner realized profits of $205,257 on renegotiable business which amounts to 34.04 percent of sales before renegotiation. There is a profit of $130,257, or 24.67 percent, after renegotiation. As we said in *Martin Mfg. Co.* v. *Renegotiation Board*,

---

[4] This is 94 percent of the total contribution to the Officer Retirement Fund.

[5] See, e.g., sec. 1459.8(e)(1) and (2), Renegotiation Board Regs., which are clearly inapplicable.

[6] Sec. 103(e) provides as follows:

(e) The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title [sections 1211–1233 of this Appendix] to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

44 T.C. 559, 564 (1965), "reasonable profits are not determined strictly on a percentage basis, either in relation to sales or net worth." In this case the use of the ratio of profits to sales is, we think, a relatively weak factor for determining reasonable profits. Petitioner made only a single product—the electronic jet engine fuel control—and its business was subject to termination at any time. In fact, it was terminated in August 1954. Moreover, respondent failed to give favorable consideration to other factors which require "fair and equitable dealing," i.e., over $400,000 in pre-1954 research and development costs incurred by Electronics and petitioner in connection with the jet fuel control. See secs. 1459.8(e)(3) and 1460.10, Renegotiation Board Regs. Favorable consideration is also given to the fact that in 1954 there was an increase in the volume of production for defense purposes. It likewise appears from this record that in 1954 production costs were reasonable.

The ratio of petitioner's profits to its net worth does not indicate that the profits were excessive. In its opening brief respondent shows petitioner's return on net worth before and after renegotiation as follows:

|  | Before renegotiation | After renegotiation |
| --- | --- | --- |
| Net worth and capital | $146, 359 | $146, 359 |
| Profit | $205, 257 | $130, 257 |
| Percent of return | 140. 24 | 88. 99 |

Using the average book net worth for the renegotiable year, *Boeing Co.* v. *Renegotiation Board*, 37 T.C. 613, 634 (1962), petition for review dismissed 327 F. 2d 885, petitioner's average book net worth in 1954 was $175,747.91. Respondent added nothing to its figure of $146,359 to take into account petitioner's development, design, and know-how. See *Boeing Co.* v. *Renegotiation Board*, *supra* at 635; and *North American Aviation, Inc.* v. *Renegotiation Board*, 39 T.C. 207, 228–229 (1962). Applying the principles enunciated in *Boeing* and *North American* to this petitioner, the following results obtain:

|  | First of year | End of year | Average |
| --- | --- | --- | --- |
| Book net worth during 1954 | $146, 359. 16 | $205, 136. 66 | $175, 747, 91 |
| Book value of petitioner's assets | 273, 088. 69 | 397, 682. 30 | 335, 385. 50 |
| Adjusted net worth | 419, 447. 85 | 602, 818. 86 | 511, 133. 41 |

Petitioner's profits for 1954, as determined by respondent, amounted to $205,257. Thus the percentage of return on adjusted net worth, using respondent's determination, is as follows:

$205, 257 to $419, 447—First of year=49 percent
205, 257 to 602, 818—End of year=34 percent
205, 257 to 511, 133—Average=40 percent

By using petitioner's determination of profits for 1954, and without regard to the pre-1954 research and development expenses, petitioner's return on adjusted net worth is as follows:

$159, 234 to $419, 447—First of year=37 percent
159, 234 to   602, 818—End of year=26 percent
159, 234 to   511, 133—Average=31 percent

Any of the above figures are substantially less than the 88.99 percent which respondent has determined as not being excessive. Consequently, we find no merit in respondent's contention on this factor. In addition, favorable consideration is given to the fact that petitioner was not dependent upon Government or consumer financing.

The extent of risk assumed by petitioner was substantial. This is borne out by Offner's convincing testimony. There is a high degree of obsolescence in the electronics field. Petitioner centered its efforts on the development and manufacture of a specialized product, i.e., the electronic jet engine fuel control. It sacrificed a potential civilian market in order to concentrate on its defense orders from Hamilton Standard.

It is clear that petitioner's contribution to the defense effort was historic and immense. Ten years of effort went into the development and perfection of the electronic jet engine fuel control. It constituted a "breakthrough" in the known art and was a significant gateway in the history of electronic gas turbine controls. It gave the United States a decided edge over its international rivals. It saved the Government millions of dollars in money and in time. Petitioner's chief executive officer, Offner, cooperated with other contractors and the U.S. armed services in furnishing them advice, assistance, and technical guidance. In 1954, petitioner made 155 engineering changes in the development and improvement of the jet fuel control. These facts, and our conclusion that the contribution to the defense effort was great, are supported by the uncontradicted testimony of Mr. Rudolph Bodemuller, now Director of Engineering and Sales of Bendix Energy Control Division of the Bendix Corp. and formerly in charge of control research and development for the U.S. Air Force which included research development of controls for rockets, ramjet, and nuclear-propulsion engines.

The character of petitioner's business deserves favorable consideration. The electronic jet engine fuel control system was intricate and complex, involving a high degree of development and production skills. The manufacture was very complex, as illustrated by some 850 change-orders required. The testimony of Offner and Bodemuller fully supports petitioner on this factor.

It is apparent on this record that petitioner performed efficiently. The quality of the product was high. Efficient use was made by petitioner of material, labor, and facilities.

Based upon our consideration of the entire record and all the facts in the light of the statutory factors, we conclude that petitioner's profits were not excessive in the fiscal year ended December 31, 1954. Accordingly,

*Decision will be entered for the petitioner.*