MARTIN MANUFACTURING COMPANY, INC., PETITIONER, *v.* RENEGOTIA-
TION BOARD, RESPONDENT

Docket Nos. 1027–R, 1029–R.   Filed July 15, 1965.

*John T. Koehler*, for the petitioner.
*R. Dickey Hamilton*, for the respondent.

#### FINDINGS OF FACT AND OPINION

ARUNDELL, *Judge:* The Renegotiation Board determined that petitioner's profits on renegotiable contracts for the manufacture of shirts and jumpers for the armed services, amounting to $270,298 for the fiscal year ended June 30, 1959, and $213,894 for the fiscal year ended June 30, 1960, were excessive to the extent of $65,000 for the fiscal year ended June 30, 1959, and $50,000 for the fiscal year ended June 30, 1960.  The reasonable amount of such profits is the only issue involved.

The evidence was heard by a commissioner for the Court, and his report, with such changes as we deem proper to meet the objections thereto filed by the parties, has been adopted as our findings of fact.

#### FINDINGS OF FACT

Petitioner is a Tennessee corporation organized in 1954 as a wholly owned subsidiary of the Drybak Corp.  Its principal office during the years 1957 through 1960 was located at Strafford, Wayne, Pa.  Petitioner's accounts were kept on the basis of a fiscal year ending June 30.

Petitioner's principal business activity at all times here material was the manufacture of shirts and jumpers for the U.S. Armed Forces under contracts with the Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot at Philadelphia, Pa. Petitioner's manufacturing was all conducted at its plant located at Martin, Tenn.

At the time of its organization petitioner acquired the assets of another unrelated Tennessee corporation of the same name.  The acquired corporation was then dissolved and petitioner adopted its name. The old Martin company had been engaged principally in manufacturing shirts and jackets for the armed services.  The Drybak Corp. manufactured hunting and fishing clothing and sports outerwear.  Drybak's president, M. A. MacQueen, became petitioner's president and another official of the old Martin company, David

Wechsler, became petitioner's vice president in charge of production. Petitioner's officers decided at the beginning that petitioner would devote its activities exclusively to the manufacture of clothing for the armed services.

Petitioner procured most of the materials for the shirts and jumpers which it manufactured from the U.S. Government. Three different types of contracts were employed, identified hereinafter as type A, type B, and type C contracts. Under the type A contract the Government furnished the materials without cost to the petitioner and petitioner manufactured the garments to Government specifications at a fixed price per garment. The materials were shipped to petitioner f.o.b. petitioner's plant under Government bills of lading. The Government paid all costs of transportation and assumed all risks of loss in transit. Petitioner furnished the findings (thread, buttons, packaging material, etc.) and bore all other costs of manufacture. Government custodians and inspectors were stationed at the contractor's plant to take custody of the goods and to inspect the work in progress.

In the calendar year 1957 the Government discontinued the use of the type A contract and adopted types B and C. Under both type B and C contracts the Government continued to furnish the goods for the garments but the contractor was required either to make a cash deposit with the Government under the B-type contracts, or furnish bond under the type C contracts, in the amount of the value of all goods shipped to it. The invitation for bids issued by the Government under type B contracts stated in paragraph 7 of the "Caution Notice to Bidder" that—

This Invitation for Bids contains a new procedure in connection with Government property. In addition to all other costs, the price bid must include the value of material secured from Government source, the cost of transporting said material to contractor's plant and the cost of returning unused material to the Government. The contractor must deposit with the Government a sum equal to the value of the Government material in advance of/or concurrent with the delivery of such material to the contractor. The new provisions relating to material obtained from the Government should be read with the utmost of care.

Petitioner's bids under type A contracts, and the bills submitted to the Government for finished garments, included all costs of manufacture except the cost, or value, of the goods from which the garments were manufactured.

The contractor under the type B contract was required to pay the cost of transporting the goods to its plant and to assume all risks of loss in transit and during manufacture. The contract specified that title to the goods would remain in the Government. The goods remained in the contractor's custody throughout the manufacturing operations. While the Government retained legal title, many of the incidences of ownership of the goods vested in the contractor when

the goods were shipped. Petitioner's president was informed that this change in the type of contract was made so that the Government would not be required to keep custodians in the contractor's plant to check on the amounts of materials used. The Government custodians stationed at the contractor's plant under the type A contracts were dispensed with under the other contracts.

Type C contracts were identical with type B except that, instead of depositing cash or a certified check, the contractors were required to post bond with the Government to cover the value of the goods shipped to them. The value of the goods shipped to them was charged to the contractors' accounts. The Government's "Caution Notice to Bidder" under the type C contract provided in paragraph 10 that—

This invitation for Bids contains a new procedure in connection with Government Furnished Material. In addition to all other costs, the price bid must include the value of material secured from Government Source, the cost of transporting said material to contractor's plant and the cost of returning unused material to the Government. The contractor must furnish a Bid Bond and a Performance Bond or other acceptable surety as required by the Provisions Relating to Material to be Furnished by the Government (MCTSA–PQMD 526 Series). The new provisions relating to material obtained from the Government should be read with the utmost of care.

The use of the type C contracts was restricted mostly to small business. Petitioner qualified as a small business concern under the Small Business Act.

Prior to its fiscal year ended June 30, 1958, petitioner's Government contracts involving the use of Government-furnished materials were all type A contracts. During 1958 it operated under both type A and B contracts. In 1959 it operated under both type B and C contracts and in 1960 under type C only.

When petitioner shipped finished products to the Government, it billed the Government for the contract price at so much for each garment. The conversion of the Government materials into finished products usually required about 90 days.

Petitioner obtained all of its Government contracts under advertised competitive bidding. Its bids under type A contracts excluded the cost of the goods furnished by the Government while under both the type B and C contracts the cost of such goods was included in the bids in accordance with the Government's instructions. After being awarded the contract, petitioner would order materials from the Government only in quantities sufficient to keep its plant running smoothly. Under type B and C contracts petitioner assumed all risks of loss of the goods in transit and after delivery to its plant. Under all of its contracts, petitioner assumed certain risks for loss of or damage to the Government-furnished materials while in its possession.

On the completion of a type A contract all of the scrap material resulting from the cutting and other processing was returned to the Government, whereas under types B and C the scrap was all treated as the property of petitioner to be disposed of as it saw fit. Under type A contracts the petitioner was required to submit to the Government a daily cutting report on the amount of goods used. These reports were not required under type B and C contracts.

Petitioner's total sales, cost of sales, both including and excluding Government-furnished material (GFM), and its profits for 1959 and 1960 were as follows:

|  | Sales | Cost of sales |
|---|---|---|
| **1959** | | |
| Including Government-furnished material (GFM) | $3,880,950 | $3,488,891 |
| Excluding Government-furnished material (GFM) | 1,495,950 | 1,103,891 |
| Profit for renegotiation | 270,298 | 270,298 |
| **1960** | | |
| Including Government-furnished material (GFM) | 2,642,876 | 2,349,553 |
| Excluding Government-furnished material (GFM) | 1,241,656 | 948,333 |
| Profit for renegotiation | 213,894 | 213,894 |

Petitioner's net worth at June 30 of each of the years 1955 to 1959, inclusive, was as follows:

| Year ending June 30— | Amount |
|---|---|
| 1955 | ($10,139) |
| 1956 | 78,410 |
| 1957 | 297,711 |
| 1958 | 426,661 |
| 1959 | 419,115 |

Since petitioner's organization, MacQueen has served as its president and treasurer. He resided and maintained an office at 1176 Muhlenberg Drive, Strafford, Pa., just outside of Philadelphia. Petitioner's bids on all contracts were prepared by MacQueen in conference, usually by telephone, with Wechsler, who was in charge of plant operations. MacQueen and Wechsler were both experienced in the shirt-manufacturing business.

The salaries paid by petitioner to its officers during the years 1956 to 1960, inclusive, were as follows:

| Name | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|
| M. A. MacQueen, president | $15,999.96 | $16,000 | $24,507.66 | $41,016.09 | $28,244.45 |
| S. Root, vice president | 9,999.96 | | | | |
| D. Wechsler, vice president | 3,125.00 | 26,844 | 36,761.55 | 60,025.02 | 43,866.67 |
| B. Needle, vice president | | | 12,000.00 | 23,000.00 | 12,000.00 |
| H. McKnight, assistant secretary | | 3,640 | 3,640.00 | 4,660.00 | 4,280.00 |
| R. MacQueen, assistant secretary | | 1,536 | 2,496.00 | 3,264.00 | 4,240.00 |
| D. B. Chase, secretary | | | None | | None |

During the period July 1959 through June 1960 petitioner submitted bids on 11 of the 17 shirt procurement contracts offered by the Government and, as low bidder, was awarded 7 of the contracts. One other

large contractor submitted six bids and obtained five contracts. The average number of bidders during the period was about three. There were not more than two bidders on four of the seven contracts awarded to petitioner and on two of them petitioner was the only bidder.

Petitioner operated its plant efficiently and at minimum costs. Its normal range of profit was comparatively small. Its products were of recognized high quality.

During 1959, 1960, and 1961 petitioner received a number of commendatory letters and awards from officials of the Military Clothing and Textile Supply Agency and other sources in recognition of its services as a manufacturer of clothing for the Armed Forces. The following letter from Maj. Gen. Webster Anderson, Executive Director of the Agency, is typical:

JAN. 11, 1961

MARTIN MANUFACTURING COMPANY
*1176 Muhlenberg Drive*
*P.O. Box 227*
*Wayne, Pennsylvania*

Gentlemen:

I express to you the Military Clothing and Textile Supply Agency's appreciation for your contribution to its achievements during Calendar Year 1960.

Your firm distinguished itself by responsible bidding, adherence to specifications, prompt meeting of delivery schedules and the business-like manner in which you executed your contractual obligations. Such performance is indicative of sound management and outstanding employee relations.

I gratefully acknowledge your contribution to the success of our mission. I thank and congratulate you, your employees and executives on a job well done.

Sincerely,

(Signed)   Webster Anderson
WEBSTER ANDERSON
*Major General, USA*
*Executive Director*

Petitioner's profits were not excessive in either the year 1959 or 1960.

## OPINION

Our sole question here is, what was the reasonable amount of profits for petitioner on the Government contracts involved in the renegotiation here under review?

We might say in the beginning that we do not regard it as determinative of that question whether petitioner's profits are to be computed with or without including the cost or value of Government-furnished material in gross sales. Actually, the only effect would be in the percentage of net profits to sales. For instance, petitioner's 1959 net sales, including the value of Government-furnished materials, were $3,880,950 and the ratio of net profits to sales 6.9 percent while, excluding such value, net sales were $1,495,950 and the profit ratio about 18 percent. Our question is to what extent, if any, petitioner's

net profits on the contracts were excessive. As we have heretofore pointed out, reasonable profits are not determined strictly on a percentage basis, either in their relationship to sales or net worth. These factors are to be given consideration along with the other relevant factors, including those specifically set out in the statute.[1]

For whatever consideration the question may warrant, however, it seems to us that the weight of the argument favors petitioner's contention that its acquisition of material from the Government under type B and C contracts was, for our present purpose,[2] substantially the equivalent of a purchase of those materials. The similarity of the financial commitments required of petitioner in obtaining the materials, that is, the deposit of the cash equivalent of the value of the goods under type B contracts and the posting of a bond under the type C contracts, to an actual cash or credit purchase is amply shown by our findings of fact. Whether petitioner purchased the materials outright or whether the Government retained legal title while the goods were being processed, with petitioner assuming most of the usual burdens of a purchaser, would seem to have but little bearing on the question of the reasonableness of petitioner's profits. In any event, we could not find an ultimate solution to that question either by including or excluding the value of the Government-furnished materials from sales.

As to the statutory factors, the evidence does not indicate that petitioner assumed or encountered any unusual risks either in its pricing or its manufacturing operations. As its president testified, petitioner was able by careful calculations to estimate accurately the costs of each garment to be manufactured. It did bear the bailee's risk of damage to the Government-furnished materials under both the type B and C contracts while the materials were in its possession, for which it was

---

[1] Sec. 103(e), Renegotiation Act of 1951, as amended:

In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

    (1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

    (2) The net worth, with particular regard to the amount and source of public and private capital employed;

    (3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

    (4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

    (5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

    (6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

[2] In *Ellis Coat Co.* v. *Secretary of War*, 9 T.C. 1004, we held that the value of "free issue" Government materials furnished a contractor should not be included in the contractor's prime costs in arriving at a proper ratio for allocating indirect cost between renegotiable and nonrenegotiable business.

insured against loss. No facts are shown indicating any likelihood of losses to petitioner from interruption of business or unforeseeable escalation of labor or other operating costs. Whatever may have been the risk of operating exclusively under Government contracts subject to immediate termination and without a protective cushion of commercial contracts, this was a calculated risk of petitioner's own choice. There is no showing that petitioner has ever suffered a loss from a cancellation of Government contracts.

In its performance of its Government contracts, petitioner maintained high standards of workmanship and plant efficiency. It developed certain quality control methods which it voluntarily shared with the whole industry. The Renegotiation Board found that—

The contractor's safety and quality control programs, together with its ability to lay out its work and adapt machinery to its requirements, contributed greatly to the contractor's efficiency.

\*       \*       \*       \*       \*       \*       \*

Favorable consideration has been given to the contractor's efficiency.

Petitioner's favorable profits experience is attributable in large measure to the good management policy and know-how of its two principal officers.

Petitioner did not have the benefit of any Government financing or Government-furnished facilities. Except for the Government-furnished materials, it operated independently of Government aid or sponsorship. Its operations did not, in fact, require any great outlay of capital. Its contracts were essentially service contracts.

All in all, we find that a fair summarization would be to say that petitioner qualifies for favorable consideration under some of the statutory factors and that in no respect does it appear in an unfavorable position.

While it cannot be questioned that the contracts here involved are subject to renegotiation under the statute, it might be pointed out that they were not of the type for which renegotiation was primarily designed. They did not involve any venture into unknown fields of science or technology and did not require any research or development work. The manufacture of the shirts and jumpers was a comparatively simple and stabilized operation. The costs were readily ascertainable by both the petitioner and the Government. Apparently, there was no urgency for the products, which might have prevented a complete negotiation of contract prices. There is in fact no showing that petitioner's profits were either more or less than the contracting parties might readily have ascertained at the time the contracts were entered into.

The contracts here were all obtained in open competitive bidding and, whether or not the bidding on some of them was sufficiently broad

and aggressive to establish fair pricing, the Government was free to reject any bid that it considered out of line.

We do not think that it was the intention of Congress to have the profits on Government contracts renegotiated merely because a contractor, by carefully estimating costs and maintaining high standards of efficiency and thrift in its manufacturing process, is able to attain a favorable profit percentage ratio. To do so would penalize the contractor for the very practices which the Government sought to encourage.

Taking into consideration all of the factors that we deem relevant, we have concluded that petitioner's profits were not excessive in either the year 1959 or 1960.

*Decisions will be entered for the petitioner.*