WINFIELD MANUFACTURING COMPANY, PETITIONER *v.* RENEGOTIATION BOARD, RESPONDENT

Docket No. 1058–R. Filed December 28, 1971.

440

*John T. Koehler* and *Daniel S. Greenstein*, for petitioner.*
*Robert R. Donlan* and *James Prentice*, for respondent.

ATKINS, *Judge:* Respondent, by an unilateral order dated September 12, 1968, determined that petitioner's profits on renegotiable contracts for the production of military trousers for the Defense Supply Agency, totaling $640,014 for its fiscal year ended June 30, 1966, were excessive to the extent of $275,000. In an amendment to its answer made at trial respondent asked this Court to increase the amount of excessive profits from $275,000 to $350,000.

The issue presented for decision is the extent, if any, to which the profits realized by petitioner were excessive in light of the statutory factors for determining excessive profits as set out in the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1211 *et seq.*

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioner is a corporation organized and existing under the laws of the State of Alabama, having its principal office in Winfield, Ala. It was incorporated in 1961. It keeps its books on an accrual method of accounting and on the basis of a fiscal year ended June 30. During the fiscal year ended June 30, 1966, petitioner performed work on 11 military contracts with the Defense Supply Agency (hereinafter referred to as DSA). Six of these contracts called for the manufacturing of poplin wind-resistant trousers (hereinafter referred to as combat trousers). The other five of these contracts called for the manufacture of cotton sateen trousers (hereinafter referred to as sateen trousers). Petitioner had no other business during its fiscal year 1966.

The terms of petitioner's 11 contracts with DSA were substantially the same, varying only in the quantities and amounts of money involved. A typical contract required petitioner to manufacture a specified number of pairs of trousers for a "Total Contract Amount," expressed in terms of dollars. The "Total Contract Amount" was composed of an amount referred to as "Total Amount Alloted to CMT Cost" and an amount referred to as "Total Government Material Value." The contract provided a "Total Unit Price" for each pair of trousers, composed of a "Cut Make and Trim Price" and a "Government Material Unit Value." The contract also provided for a percent-

---

*Brief *amicus curiae* was filed by Richard B. Barker and Eric R. Fox, as attorneys for Blue Bell, Inc., successor in interest to Hicks-Ponder Co.

age discount based upon the "Total Contract Amount" for prompt payment by the Government.

Each contract contained a series of provisions referred to as the "GEP Bailment System." Under article A of the GFP Bailment System, DSA agreed to make available to the petitioner certain specified material (hereinafter referred to as Government-furnished material or as GFM) for use in the performance of the contract. DSA was to be the sole supplier of such material and only such material obtained from DSA could be used in the performance of the contract. Article A set forth a certain unit price per yard for the GFM. Article A also stated that it was the sole responsibility of the petitioner to determine the quantity of GFM necessary for the performance of the contract. DSA, however, reserved the right to require petitioner to justify its requests for GFM if it thought petitioner was requesting excessive quantities of GFM.

The GFP Bailment System also contained the following provisions:

E. PAYMENT: Upon delivery of end items, $2.19 per unit [the amount specified in the contract as the "Government Material Unit Value" per pair of trousers, which varies in the different contracts] will be deducted from the contract price and applied to cover the value of the Government material; and the balance of the contract price, less discounts computed on the basis of the total contract price, shall be paid to the contractor. Prior to final payment, an adjustment of the Government material account shall be made as follows: if the amounts deducted from the contract price pursuant to this Article to cover the value of the Government material exceed the value of all such material furnished the contractor, the contractor shall receive payment of the excess amount; if the total value of Government material furnished the contractor exceeds the amounts deducted from the contract price pursuant to this Article to cover the value of the Government material, the contractor shall reimburse the Government for the value of such material for which deductions were not taken. Regardless of the amount of Government material consumed, the unit cost to the Government of each item accepted including Government material shall not exceed the contract unit price for the item. * * *

F. VALUE OF GOVERNMENT MATERIAL FURNISHED CONTRACTOR: To determine the total value of Government material furnished the contractor, the contractor will be charged for the total value of materials furnished at unit prices [per yard] stated in Article "A" above less $2.19 per rejected end item purchased by the contractor pursuant to Clause H. 1. below and will receive credit at the unit price specified in Article "A" above for Government material unconsumed in the performance of the contract and returned by him in an undamaged condition to the Government in the form of full pieces and short pieces.

G. OBLIGATION OF FUNDS: Funds will be obligated on the assumption that the price of each unit includes $2.19 for Government material and the balance, representing other contractors' costs and profits, is to be paid from obligated funds. If the contractor uses Government material per unit of a value other than

as stated in this article, the obligation of funds will be adjusted as follows: In the event contractor uses more material the obligation of funds will be reduced and if the contractor uses less material the obligation of funds will be increased. This possibility has been taken into consideration in funding this contract.

H. CONTRACTOR INVENTORY:

1. IRREPARABLE REJECTS: The contractor agrees to purchase any or all irreparable rejects when notified in writing by the Contracting Officer, or his duly authorized representative, at $2.19 per unit. * * *

\* \* \* \* \* \* \*

K. RESPONSIBILITY FOR GOVERNMENT MATERIAL: The contractor assumes the risk of and is responsible for any loss or damage to Government material regardless of the cause, from the time the material is delivered to the carrier at the originating location to the time it is redelivered by the contractor to the Government. It shall be the contractor's responsibility to obtain such insurance, as he may deem necessary, at his own expense.

\* \* \* \* \* \* \*

M. PROTECTION OF GOVERNMENT MATERIAL, TITLE, ACCESS: The contractor shall maintain and administer, in accordance with sound industrial practice, a program for the maintenance, protection and preservation of Government material, until disposed of by the contractor in accordance with this contract. Property shall be maintained and used only in those plants approved by the Contracting Officer. Contractor shall arrange and maintain his plant(s) to insure clean and sanitary conditions and insure proper identification and segregation of material for each Government contract. Title to the Government material shall remain in the Government and shall not be affected by the incorporation or attachment thereof to any property not owned by the Government. The Government shall at all reasonable times have access to the premises wherein any Government material is located.

Under the terms of the GFP Bailment System, petitioner had to accept GFM with minor defects. But DSA agreed to replace any GFM in which there were substantial defects and to make good any shortages in amounts supplied.

At another point in the contract, petitioner's particular attention was invited to the payment article of the GFP Bailment System, "wherein it provides for a deduction from payments to cover cost of Government Material furnished the contractor. This is an administratively determined rate to be offset against the value of Government Material furnished the contractor and should not be used by the bidder for determining his material requirements on which to base his bid price."

During the course of its performance in fiscal 1966 under the 11 contracts, petitioner periodically requested and received deliveries of GFM from DSA. Deliveries were usually in lots substantially smaller than that required for performance of the entire contract. When DSA made delivery of GFM to petitioner it debited petitioner's account in an amount determined by multiplying the number of yards

of GFM delivered by the price per yard specified in the contract under article A of the GFP Bailment System.

When petitioner received a quantity of GFM, it entered a current liability on its books payable to DSA for the amount of GFM received. During the course of manufacturing no further entries were made in this account. The value of the GFM was also included on petitioner's books in its inventories. When finished items were delivered to DSA, petitioner would bill DSA for an amount equal to the "Total Unit Price" specified in the contract multiplied by the number of pairs of trousers delivered. The amount billed was broken down into an amount for GFM and an amount for cut, make, and trim. On its books, petitioner recorded the entire amount billed as the amount of the sale to DSA. Petitioner would also apply the amount billed for GFM as an offset to its current liability account payable to DSA for GFM, thereby reducing such account by the amount of GFM for finished items. The balance of the total amount billed to DSA, representing an amount for the cut, make, and trim, was recorded as an account receivable due from DSA.

Upon receiving acceptable finished items, DSA would credit petitioners' GFM account for the amount of GFM billed. DSA would also send a remittance to petitioner with an explanatory voucher. The voucher indicated the total amount billed for the finished items, less any discount on this amount for prompt payment, less the amount credited to petitioner's GFM account, leaving the balance as the amount paid to petitioner.

During fiscal 1966, petitioner invoiced DSA a total sum of $6,897,965 for finished items delivered, of which amount the sum of $3,598,757 represented the cut, make, and trim costs, overhead, selling and administrative costs, and profits. The balance of the sum amounting to $3,299,208, represented the value of GFM used in performing petitioner's renegotiable contracts. Such sum of $3,299,208 was deducted from the contract price, according to the terms of petitioner's contracts with DSA and was not paid to petitioner by DSA or the United States. Petitioner's total costs for cut, make, and trim and other expenses for fiscal 1966 amounted to $2,958,743, resulting in profits to petitioner for fiscal 1966 in the amount of $640,014.

In its Federal income tax return for fiscal 1966, petitioner included the value of GFM in its gross receipts from sales and in its cost of goods sold. Its balance sheet also included the value of GFM in inventories and in its liabilities. Eliminating the value of GFM from such return would not affect the taxable income of petitioner or net worth for fiscal 1966. Petitioner's opening net worth for fiscal 1966 was $123,666.98 and its closing net worth was $439,631.64.

Due to the requirements of the United States' involvement in Vietnam, DSA's procurements of military clothing substantially increased beginning in July 1965. In its fiscal year ended June 30, 1966, DSA's procurement of all types of military clothing increased in amount to $378,200,000 from an amount of $94,800,000 in fiscal 1965. Its procurement of combat trousers increased to 3,869,725 pairs for fiscal 1966 from 125,160 pairs for fiscal 1965. At times during fiscal 1966, DSA also had to request contractors to accelerate deliveries under existing contracts to meet critical supply situations caused by the Vietnam involvement.

Where practicable DSA is required to award contracts to the lowest bidder after formally advertised competitive bidding, but may disregard such requirement whenever the public exigency will not permit the delay incident to that procedure. 10 U.S.C. sec. 2304. In fiscal 1966, due to the urgent need for items, DSA, in order to avoid the delay incident to formal advertising for competitive bids, began to send requests to qualified manufacturers for pricing proposals in order to negotiate contract awards. DSA considered that there were in excess of 60 manufacturers qualified to produce combat and sateen trousers. In negotiating contracts for these items, DSA depended on a relatively few manufacturers. During fiscal 1966, the largest number of manufacturers submitting pricing proposals for combat trousers was seven and the largest number for sateen trousers was 22. Most of the qualified manufacturers were operating their facilities to maximum capacity with commercial work. Later in fiscal 1966, the need for combat and sateen trousers became more urgent and DSA was unable to meet it by relying on its usual suppliers. In December 1965, it began issuing rated orders, which are unsolicited awards to contractors to manufacture a specified quantity of trousers at a specified price.

Most of the awards of negotiated contracts for combat and sateen trousers involved multiple awards to a number of manufacturers for each procurement because the quantities involved were too large for any one manufacturer to handle satisfactorily. Most responsible manufacturers who submitted reasonable pricing proposals received awards. During fiscal 1966, the prices that DSA paid for combat and sateen trousers increased, particularly when it awarded contracts to manufacturers who had never made such items previously.

Under its six contracts for the manufacture of combat trousers, petitioner delivered a total of 623,793 pairs during fiscal 1966 and billed DSA $2,034,875.21 for cut, make, and trim and $1,363,226.81 for GFM. Under its five contracts for the manufacture of sateen trousers, it delivered a total of 1,452,652 pairs and billed DSA $1,558,408.69 for cut, make, and trim and $1,935,981.59 for GFM.

Of the 11 contracts under which petitioner performed in fiscal 1966, four contracts were advertised contracts, six were negotiated contracts, and one was a subcontract for Oxford Manufacturing Co. which had received a rated order from DSA. Four of these contracts had been awarded in fiscal 1965 and seven in fiscal 1966. Eight contracts were part of multiple awards and three had been awarded solely to petitioner.

In submitting price proposals on advertised contracts, petitioner was always among the low bidders. The same was also true when DSA was requesting price proposals for negotiated contracts. The price proposals submitted by petitioner were competitive with those of other qualified manufacturers. On the 11 contracts under which petitioner performed in fiscal 1966, it submitted the lowest price proposal on 3 contracts, and on another it and another contractor submitted the same price proposal, which was the lowest. In no case did the petitioner submit the highest proposal. During fiscal 1966, petitioner submitted proposals on no items other than combat and sateen trousers.

Combat trousers have a number of specially designed features, not normally found in men's trousers, which adapt them for their use in combat. The sateen trouser is a basic fatigue trouser. Combat trousers are considerably more difficult to make than sateen trousers. In terms of its costs, petitioner could produce about 2½ pairs of sateen trousers for the same cost as one pair of combat trousers.

The manufacture of combat and sateen trousers is not an automated process. It involves numerous different steps, many of which require the operation of machines by skilled employees. DSA's specifications set forth a certain number of operations for the manufacture of trousers. These specifications need not be followed precisely and the exact number of operations in petitioner's manufacture of combat and sateen trousers was determined by its own production engineering.

In its production engineering, petitioner tried to break the process down into as many individual steps as possible in order to make each step relatively simpler. This made it easier for petitioner to train its employees to perform such operations. The number of steps into which the process could be divided was affected by the increased difficulty of coordinating the various steps for an orderly production flow, which would result if too many steps were used.

The production process began with an examination of the quality of the GFM to be used. The cloth was then cut into pieces according to patterns supplied by DSA. DSA's specifications in this regard were quite demanding and had to be closely adhered to. A pair of combat trousers consisted of 38 separate cut pieces. Petitioner arranged the patterns for the individual pieces in such a manner as to

reduce to a minimum the amount of unusable cloth remaining after the cutting operation had ended. Cut pieces had to be marked according to shade to insure that the shades of all the pieces in the finished pair of trousers were properly matched according to DSA's specifications. At the sewing stage of production, the process as engineered by petitioner involved 70 distinct operations for combat trousers and 22 operations for sateen trousers.

The most critical operation involved in the production of combat and sateen trousers was the operation of double-needle sewing machines. Combat trousers involved more double-needle sewing than sateen trousers. Operation of a double-needle sewing machine requires a high degree of manual skill of an employee. Such an employee is the highest paid employee in the production process, but is also the cause of most of the mistakes in production.

It was harder for petitioner to train an employee to operate a double-needle sewing machine than the other machines in the production process. Some operations could be taught in as little as 2 to 3 weeks. In order to train an inexperienced employee to do acceptable work with a double-needle sewing machine petitioner required 3 to 4 months. During this period, the employee sometimes damaged the cloth so severely that production could not continue on the pair of trousers involved.

As a part of the production process, petitioner also maintained a quality-control program as required by DSA. Petitioner's quality-control program involved not only a final inspection of finished trousers but also an interim control program designed to closely monitor various steps in the production process in order to catch mistakes before any substantial damage was done to overall production.

In its performance under the 11 contracts during fiscal 1966, petitioner did all necessary work itself and did not subcontract any of the work done. Petitioner's rate of inventory turnover, calculated on a basis of including in inventory the value of the GFM, was 19 times during fiscal 1966. The rate of turnover calculated by excluding the value of GFM was 35 to 40 times. The average rate of inventory turnover for a commercial manufacturer was six to eight times during a fiscal year.

By the beginning of fiscal 1966, petitioner was an experienced manufacturer of combat and sateen trousers. From the time of its organization in 1961, petitioner had produced nothing other than military items for DSA. Petitioner first started manufacturing sateen trousers around fiscal 1963 and had its first contract for combat trousers in fiscal 1964. Petitioner lost money in its performance of its first contract for combat trousers and the result from all operations

was a loss in the amount of $48,255.83 for fiscal 1964. In fiscal 1965, petitioner became more involved in the manufacturing of combat trousers in addition to sateen trousers. It began to do better after it had reengineered the production process for the combat trousers. It billed DSA a total of $3,573,686.89, including the value of GFM, and realized a profit of $70,003.14. Performance under the contracts in fiscal 1964 and 1965 involved the operation of double-needle sewing machines and by the beginning of fiscal 1966 petitioner was a manufacturer skilled in the use of the double-needle sewing machine.

During fiscal 1966, petitioner's operations were efficient and it was one of the best manufacturers of combat and sateen trousers for DSA. Its plant at Winfield, Ala., and its plant at Golden, Miss., were very well run.

In order to accommodate DSA's increased needs for trousers and its requests for accelerated deliveries, petitioner undertook to expand its production capacity considerably during fiscal 1966. It expanded its operations at its Golden plant by moving into temporary facilities at Padin and Tishomingo, Miss. While these facilities were being used, petitioner was building a permanent expansion to its Golden plant. When this was completed in early 1966, the operations from the temporary facilities were transferred to it. During this period, petitioner was able to maintain all its production schedules.

In order to expand its capacity, petitioner also had to increase its labor force. In the beginning of fiscal 1966, petitioner employed 424 people in its operations. At the end of fiscal 1966, it employed 678, representing an increase of 254 people or 60 percent. In addition to this, petitioner had a high employee turnover rate at its Winfield plant and a lesser rate at its Golden plant. As a result of these facts, petitioner had to train a large number of new employees during fiscal 1966 which increased the risk of loss to petitioner from mistakes of inexperienced employees.

In its production during fiscal 1966, petitioner averaged 14.7 pairs of combat trousers per machine per 8-hour day and 33 pairs of sateen trousers per machine per 8-hour day. The production norm for an experienced contractor with a well-balanced production line was 11 to 12 pairs of combat trousers and 30 to 33 pairs of sateen trousers per machine per 8-hour day.

During fiscal 1966, petitioner always met the delivery schedules under its 11 contracts and in a number of instances it accelerated deliveries at the request of DSA. In accelerating deliveries, petitioner had its employees work up to an average of 14 hours per week of overtime. Overtime was also used on a sporadic basis to eliminate production delays.

Petitioner always operated its plants at full capacity while performing under its contracts. Under the terms of three contracts, DSA had an option to increase, at the contract price, the total production by 50 percent. During the option period, petitioner had to reserve the necessary plant capacity to cover any increased production. This subjected petitioner to the risk of having idle plant capacity if DSA should not exercise the options since it prevented petitioner from seeking other business for the reserved capacity. Before the end of the option periods. DSA exercised the options and petitioner continued to operate its plants at full capacity.

DSA assumed the responsibility for the inspection of the finished trousers at petitioner's plant. During fiscal 1966, petitioner had no lots of finished trousers under its 11 contracts that were ultimately rejected by DSA for failure to meet contract specifications. In a relatively few instances, petitioner delivered lots that were initially rejected by DSA. All of these rejections were overcome either by repairs by petitioner or by a waiver of specifications by DSA. During fiscal 1966, DSA was comparatively lenient in granting waivers because of its great need for the finished items. The cost of repairs was borne by petitioner.

During fiscal 1966, DSA had some difficulty in interesting qualified manufacturers in the production of combat trousers. It requested that production engineers of six or seven manufacturers be allowed to visit petitioner's plant for technical assistance. At that time petitioner was the largest producer of combat trousers and was the only one of which DSA requested this assistance. Petitioner gave these engineers a complete breakdown of its production engineering and the details of its quality-control program. Subsequently all of these manufacturers became involved in the production of combat trousers.

There was no substantial difference to petitioner, in terms of risk of loss of material due to destruction thereof or damage thereto, between using GFM and purchasing its materials itself. The risks in this respect to which petitioner was subject were no different from those of a normal commercial manufacturer. Petitioner maintained an insurance policy for the GFM while in its possession. The insurance covered transportation risks, and the general risks of fire and windstorm with extended coverage of vandalism and malicious mischief. The insurance did not cover the risk of damage to the GFM during manufacturing operations or the risk of theft or flood or water damage. Petitioner, however, had never had any substantial theft or water or flood damage.

Statistics published by the Treasury Department, Internal Revenue Service, show that for the period from July 1965 to June 1966, there were 2,677 corporations engaged in the manufacture of men's and

boys' clothing which filed Federal income tax returns, some reporting net income and some reporting no net income. Such statistics show that the 2,677 manufacturers had average sales, costs, and profits before taxes measured by income in the respective amounts of $2,167,317, $2,070,405, and $96,912. The average rates of profit before taxes to costs and to sales for these 2,677 corporations were 4.7 percent and 4.5 percent, respectively. The average net worth of these 2,677 corporations was $544,030 and the rate of profit before taxes to net worth was 17.9 percent.

Such statistics show that 2,058 of the above corporations reported net income. Such corporations had average sales, costs, and profits before taxes in the respective amounts of $2,662,311, $2,525,243, and $137,068. The average rates of profit before taxes to cost and to sales for these 2,058 corporations were 5.4 percent and 5.2 percent, respectively. The average net worth of these 2,058 corporations was $686,079 and the rate of profit before taxes to net worth was 20 percent.

The petitioner's profits of $640,014 from the above renegotiable contracts during its fiscal year ended June 30, 1966, were excessive to the extent of $100,000.

OPINION

The issue presented for decision is the extent, if any, to which petitioner's profits under its renegotiable contracts for its fiscal year ended June 30, 1966, were excessive as that term is used in the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1211 *et seq.* Section 103 (e) of the Act provides as follows:

(e) EXCESSIVE PROFITS.—The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require which factors shall be published in the regulations of the Board from time to time as adopted.

Up to the year in question, the Renegotiation Board had adopted no regulations setting forth any additional factors for consideration in determining whether profits are excessive.

The first contention of the petitioner is that in computing its sales and cost of goods sold under its renegotiable contracts the value of GFM must be included. Respondent conversely contends that the value of GFM under the terms of the contracts is not includable in sales and cost of goods sold. The significance of this issue is that it will affect the ratios of renegotiable profits before taxes to sales and to cost of goods sold. Under the petitioner's position, the percentages will be lower and under the respondent's, they will be higher. On brief each party has argued this point at considerable length and with great vigor, and urged this Court to decide this question, citing prior cases in which we have considered the ratios of profit to sales and to costs in determining whether or to what extent profits are excessive.

At the outset it should be pointed out, as was done in *Martin Manufacturing Co.* v. *Renegotiation Board*, 44 T.C. 559, that reasonable profits are not determined strictly on the basis of their ratio to sales and net worth. Such ratios are to be given consideration along with the other relevant factors, including those specifically set forth in the statute.

With regard to the effect of the relationship of profit to cost or to sales in determining the reasonableness of profit in cases involving customer-furnished materials, section 1460.12(b)(2) of the Renegotiation Board Regulations provides as follows:

(2) A contractor who uses customer-furnished materials generally is not entitled to as large a dollar profit as the dollar profit to which such contractor would have been entitled had it furnished the materials itself. In the latter case, the contractor would have expended effort in finding or acquiring materials, would have invested capital in the materials and would have assumed the risks of obsolescence, spoilage, or other loss inherent in owning such materials. Although the aggregate dollar profit allowed the contractor in the former case should not be as great as it would be if such contractor furnished its own materials, nevertheless the dollar profit allowed will usually result in a larger percentage of sales than the dollar profit which would have been allowed if the materials had been purchased by the contractor and, therefore, included in its sales and costs.

This regulation apparently contemplates the exclusion from sales of the value of customer-furnished materials in calculating the percentage of profit to sales for purposes of comparison of the relationship of profits to sales under a contract involving GFM with such relationship where the contractor furnishes his own material. However,

we think no flat rule should be adopted in this respect. Perhaps such a rule would be justified in cases where the contractor assumes no risk or burden whatever with regard to the acquisition or protection of such material. On the other hand if the contractor assumes the risks of an owner and is otherwise in substantially the same position as a contractor who furnishes his own material, we see no reason why, for this purpose, the value of the GFM should not be included in sales. Further, if the contractor assumes some, but not all, of the risks and burdens of a contractor who acquires his own material, we see no reason why the value of the GFM should not be included for this purpose, provided proper consideration is given to the risks and burdens of which he is relieved as a result of the fact that the Government has furnished the materials. Actually, it would seem to be immaterial, for this purpose, whether or not GFM is included in sales, provided in either case there is taken into account the similarity or dissimilarity of the contractor using GFM to a contractor who acquires his own materials.

Under the terms of its contracts petitioner bore the risk of loss of the GFM due to destruction thereof or damage thereto during transit or during the manufacturing process, and in this respect the risk to the petitioner was the same as if it had purchased the materials itself from outside sources. On the other hand it was relieved of a number of burdens by not having to purchase the materials itself. Petitioner did not incur any expense in locating and purchasing the material and did not have to finance its acquisition by its own capital or through outside sources. It was relieved of the possibility of rejection of the finished items due to defects in the quality of the materials and there was no possibility of its having any unsalable inventory remaining after production had ended. Further, the petitioner bore no risk of increase in cost of materials necessary to complete the contracts. It thus appears that for purposes of determining whether petitioner's profits were excessive petitioner cannot be treated the same as if it had purchased the materials itself.[1]

Respondent introduced statistical data prepared by the Internal Revenue Service analyzing the profits of manufacturers of men's and boys' clothing for the period July 1965 to June 1966, as shown by income tax returns. This data shows that the average ratio of profits, before taxes, to sales was 4.5 percent. The average ratio was 5.2 percent if only those returns showing a net profit are used in the calculation. Since those statistics include sales of all types of men's and boys'

---

[1] In *Martin Manufacturing Co.* v. *Renegotiation Board,* we stated that the contractor's acquisition of material from the Government under its contracts was substantially the equivalent of a purchase of the material, pointing out that the requirement that the contractor deposit the cash equivalent of material furnished under its type B contracts and the posting of a bond under its type C contracts, was similar to an actual cash or credit purchase. In this respect that case is distinguishable from the instant case.

clothing they do not provide an accurate measure of the normal profits from the manufacture of the two types of trousers petitioner manufactured. We also note that the respondent compares the above averages to the ratio of petitioner's profits to sales, excluding GFM. However, we cannot ignore the fact that in some respects petitioner is comparable to a manufacturer who does not use GFM. In view of all the foregoing, we have had to discount appropriately the respondent's analysis of petitioner's profits, before taxes, to sales.

The petitioner's president, who has been engaged in the garment industry since 1935, testified to the effect that he would consider that normal profits, before taxes, in the garment industry prior to the Vietnam War was about 10 percent of sales under both commercial and Government contracts and that he considered that such would be a normal profit for petitioner in fiscal 1966. In his comparison he apparently made no distinction between normal profits where GFM was involved and where it was not. As stated above, we think the petitioner here was relieved of much of the risk and responsibility borne by a contractor who furnished his own material, and this detracts from the weight to be accorded this testimony.

We turn now to a consideration of the facts of this case in light of the statutory factors set forth above. Petitioner was an efficient manufacturer. It had produced both combat and sateen trousers prior to fiscal 1966 and by fiscal 1966 it was an experienced manufacturer of both. During fiscal 1966, petitioner always met its production schedules and in a number of instances it accelerated production at DSA's request. The quality of petitioner's production was excellent, with only minimal initial rejection of lots by DSA and none that were not ultimately accepted after either repair or a waiver of contract specifications. In order to accommodate DSA's increased needs for trousers and its requests for accelerated deliveries occasioned by the Vietnam involvement, petitioner expanded its production capacity during fiscal 1966. It significantly increased both its facilities and labor force. Throughout the expansion period it continued to meet its production schedules and maintained the quality of its production. Petitioner also always operated its plants at full capacity while performing under its contracts. It also appears that petitioner attained economy in the use of materials. One of the respondent's witnesses testified that petitioner was one of the best of the manufacturers of the two types of trousers for DSA. We have, accordingly, given petitioner favorable recognition from the standpoint of efficiency.

Petitioner submitted no data as to the costs of other contractors from which we can evaluate the reasonableness of its costs. Petitioner argues that the fact that its pricing proposals to DSA were always among the

lowest submitted establishes that its costs were reasonable. This in our opinion is not sufficient since there is no evidence as to the comparability of petitioner's costs to those of such other contractors or as to the reasonableness of such other contractors' costs. An extended analysis of the reasonableness of petitioner's costs and profits is also rendered impracticable because of a lack of any comparisons based upon petitioner's other experience. Through fiscal 1966, it had produced only for DSA and therefore it had no costs and profits on any nonrenegotiable business with which to compare its costs and profits under its renegotiable contracts. Nor does petitioner's prior history in producing the two items for DSA offer any comparative basis for analyzing the reasonableness of its costs and profits in fiscal 1966. In fiscal 1964, petitioner operated at a net loss due to production difficulties and in fiscal 1965, it had a small profit as it began to overcome such difficulties. Finally, petitioner has failed to introduce any evidence as to what effect its greatly increased volume of production during fiscal 1966 had upon its costs and profits. In view of the foregoing, we must conclude that petitioner has failed to establish that it is entitled to favorable consideration under the reasonableness of costs and profits factor contained in section 103(e)(1) of the Act.

Section 103(e)(2) sets forth as a factor the net worth, with particular regard to the amount and source of public and private capital employed. Petitioner's opening net worth for the fiscal year 1966 was $123,666.98 and its closing net worth was $439,631.64. During the year petitioner received GFM of a total value of $3,299,208 for which it incurred no obligation to make a cash outlay. While it is true that had the petitioner provided its own material, it would not have been necessary to purchase at one time all the material to be used during the year, the fact remains that DSA was the source of all the capital necessary to provide the material, and this constituted a very substantial portion of the capital employed by petitioner in the performance under its contracts. It is our conclusion that petitioner is not entitled to favorable consideration under this factor.

The petitioner contends that in performing its contracts in the year in question it was subjected to substantial risks. In support thereof it points to the fact that in its fiscal year 1964 it sustained a loss under contracts for the manufacture of combat trousers. However, it appears that the petitioner thereafter successfully reengineered its production processes and by the beginning of its fiscal year 1966 was an experienced manufacturer of the trousers. We are, therefore, of the opinion that the petitioner's prior experience does not establish that in the year 1966 it was subjected to any substantial risk. Petitioner also refers to the risk which it assumed under its contracts with

respect to any loss of GFM. Under the terms of its contracts petitioner bore the risk of loss of GFM after it had received it even though ownership was still in DSA. Petitioner carried insurance which covered most of such risks to which it was subjected. With one exception, it does not appear that any risk not covered presented any real danger to petitioner. The one significant risk not covered by insurance was the risk of damage to GFM during the manufacturing process, and we agree with the petitioner that this risk was increased during the fiscal year 1966 because of its expanded labor force and its need to train new employees. Petitioner has offered no other evidence with respect to risks assumed under its contracts. It is our conclusion that the petitioner is entitled to but little favorable consideration on account of risk assumed.

In the fiscal year 1966, DSA, for the purpose of interesting other manufacturers in manufacturing combat trousers, requested petitioner to allow production engineers of several manufacturing companies to visit petitioner's plant for technical assistance. The petitioner was cooperative in this regard and gave such engineers a breakdown of its production engineering and its quality-control program. We have given the petitioner appropriate favorable consideration for its contribution to the defense effort.

Petitioner contends that the manufacturing process employed in supplying the trousers for DSA was a highly complex and difficult operation. It has made particular reference to the difficulties involved in training operators for double-needle sewing machines, the most important operation in the entire production process. It contends that the combat trouser is one of the most difficult articles of clothing to produce and only by comparison to the combat trouser is the sateen trouser easy to manufacture. We have carefully examined all the evidence presented upon this subject, and have described in some detail in the Findings of Fact the steps involved in the manufacture of these trousers. While there are many steps involved, particularly in the case of the combat trouser, and while it appears that the operation of the double-needle machine requires a considerable degree of manual skill on the part of the operator, we do not think that the evidence establishes that the manufacture of either type of trouser involved any significantly complex technique. It is our conclusion that petitioner is entitled to very little favorable consideration under the "character of business" factor.

Based upon a full consideration of the record in the light of the statutory factors, we have concluded and have found as a fact that petitioner's profits under its renegotiable contracts during its fiscal year 1966 were excessive to the extent of $100,000.

*Decision will be entered in accordance with the foregoing.*